439 P.2d 821

**STATE of Arizona, Appellee,**

v.

**Chester S. HOWLAND, Appellant.**

**Nos. 1580, 1581.**

Supreme Court of Arizona.

In Division.

April 10, 1968.

Rehearing Denied April 30, 1968.

Darrell F. Smith, Atty. Gen., Gary K. Nelson, Asst. Atty. Gen., for appellee.

Max M. Klass, Phoenix, for appellant.

McFARLAND, Chief Justice:

Chester S. Howland, hereinafter referred to as defendant, was arrested on June 2, 1964, charged with kidnapping a minor child in violation of § 13-491, 5 A.R.S. (1956) (with prior conviction), and later released on bond. Then, on August 5, 1964, he was arrested again and charged with forcibly kidnapping a female child under fourteen years of age for the purposes of committing lewd and lascivious acts (with prior conviction), under § 13-492, 5 A.R.S. (1956), making it a capital offense where serious bodily harm is inflicted on the kidnapped child. Thereafter, the allegation referring to bodily harm was deleted. On November 6, 1964, defendant withdrew his plea of not guilty to each charge, and entered pleas of guilty.

Defendant was sentenced to serve a term of not less than twenty-five years to life imprisonment in the Arizona State Prison for the first case, No. 44489, and a term of not less than twenty-five years to life imprisonment on the second case, No. 44880, to run consecutively with the first term. Prior to sentencing, defendant's counsel moved for and was granted a hearing in mitigation of sentence for the purpose of presenting testimony of two psychiatrists.

The questions presented by counsel for defendant in this appeal are that the sentences are too severe and disproportionate to the crimes involved, considering the age

(34) and general character of defendant, and therefore a greater punishment than ought to be inflicted under the circumstances; that inflammatory and notorious newspaper coverage prevented defendant from having his punishment fairly determined; that the sentences running consecutively was based upon speculative considerations of crimes not yet committed deprived him of rights guaranteed by the Constitution of Arizona, and constituted cruel and unusual punishment in violation of the 5th, 8th, and 14th Amendments to the Constitution of the United States.

Defendant, in the appendix of his brief, sets forth a long list of cases showing dispositions under this type of offense, and attaching newspaper articles in regard to defendant and his case, which he contends were so prejudicial that they prevented a fair and impartial sentence by the court.

In determining a proper sentence the court should consider the purpose of the sentence and the objectives sought to be attained. These objectives are usually enumerated as four-fold: retribution, deterrence, restraint, and rehabilitation.

In the instant case an examination of the record indicates that the court was basing the sentences primarily upon the third objective—namely, restraint. Defendant had a long record of sex deviations involving small girls, starting when he was a boy twelve years of age. The psychiatrist who testified states:

"* * * There the psycho-sexual conflict and quirks seemed to go back at least that far. * * *"

Defendant was a highschool graduate and had done some work in college. He entered the airborne infantry, saw service in Korea, and was awarded the purple heart. He had some psychiatric history while in the service. In 1950 he was hospitalized for psychiatric observation following a suicidal attempt when he sought to evade a court-martial due to his involvement in a gasoline theft. After spending some time in the stockade he returned to duty and earned an honorable discharge in 1952. There was an early marriage in 1953, which did not prove successful. His first brush with the law was in 1955, when he served time in the Ohio State Reformatory for Burglary. In 1958 defendant was convicted of child stealing in Cincinnati, Ohio, for which he served time in the state penitentiary. One of defendant's psychiatrists stated that his conduct in the commission of that crime was similar to that in the instant case.

Defendant was given psychiatric help in four distinct periods of his life over the last ten years; starting in 1952 with the Army; in connection with the offense in Ohio; and in 1963 in connection with offenses in Arizona, where he was given an opportunity for psychiatric help at the Veterans Hospital in Phoenix which followed an incident of obscene telephone calls which he had made; and, then, the last time, following the recent incidents. At the time of the recent events, he was married and his life as described by the psychiatrist appeared to be a good one. He had a congenial marriage—his last wife having two children before the marriage, which gave him the associations of home life. He had a good reputation, a job, everything was going all right, and, then, according to testimony, he almost without warning would break over into these actions which resulted in the instant cases against him.

It would serve no purpose to describe his behavior in detail. The recommendations of the psychiatrists can be summed up in that they did not think there was evidence of actual psychosis. He was described as a man fully aware of his emotions and actions, which he could not or did not control —particularly when drinking. He was described by Dr. Richard Duisberg as:

"A sensitive person, over sensitive, I think; very involved with himself and unable to apparently unravel certain patters [sic] of thinking and feeling, complexes or conflicts. In the main he repeatedly indicated a desire for some sort of help in understanding himself but apparently his difficulties had led to incarceration, but getting no or getting little

psychiatric help and this seems to be the main wish now. He indicated that he felt that it was quite likely that he would have to accept some sort of punishment, incarceration again but hoped that it wouldn't just all be punitive; that the time could be spent in his gaining some understanding of his pattern, of this abberration."

Dr. Maier I. Tuchler, the other psychiatrist, testified to the effect that "This man has a character disorder, a serious character disorder." Defendant was described by both psychiatrists as a man who needed psychiatric treatment. Dr. Tuchler recommended that defendant:

" * * * be placed in maximum security for the protection of society. That is my responsibility as a physician and member of society; that within the maximum security institution there should be some opportunity to work out the problems that can be worked out, if possible, and psychiatric services available within the maximum security institution. This is my recommendation.

"Now, if further opportunity were available there should be a treatment institution for sexual problems, for sexual offenders, for repeated sexual offenders, in which the person actually committed as a repeated sexual offender for an indeterminate sentence has the opportunity to prove that he can be rehabilitated. Not that the State should be forced to accept him but that he should prove by his own progress that the opportunity is available to him. In other words, within the maximum security institution or another institution there should be an opportunity to rehabilitate sexual offenders and this should be available if the treatment program at all is part of the logic in penology. * * *"

He further stated that defendant merited society's effort to rehabilitate him.

His history, and the testimony of the psychiatrists are to the effect that society is entitled to a protection from this individual unless or until he can be rehabilitated. The doctors do not definitely say that this can be done. They merely state that it is a realistic goal. In the words of Dr. Tuchler:

"It may not be this year but some years from now in the forseeable [sic] future there may be some program available."

Under these circumstances, since the third purpose of punishment—"restraint"—is needed to prevent other crimes by the individual, we are unable to say the punishment was for too long a period of time.

We now come to the recognition of the law for rehabilitation and the question of whether the sentence is such that it deprives him of this opportunity.

In 1927, this Court, in Orme v. Rogers, 32 Ariz. 502, 260 P. 199, discussed crime and the general history of criminology, and the theory applying to punishment therefor. The question in Orme v. Rogers, supra, was in regard to the application of the provisions of the law providing for extra time for good conduct. In that case, we said:

"In view of the course of legislation in the state of Arizona above recited, as examined in the light of the general history of criminology and the theories applying thereto, we are fully convinced that when the rule for good conduct time was first laid down it was given to the prisoner as a matter of *absolute right*, to be applied only in cancellation of the *definite debt he was held to owe the state*, and that such rule has never been changed. We are of the opinion that counsel for petitioner has been misled by the erroneous view that the so-called 'minimum sentence' is, as a matter of law, a period fixed at which some portion of the debt which the law assumes the prisoner owes to the state is canceled. As we have pointed out, this is not true. Under the Indeterminate Sentence Law, the only time at which the prisoner could ever claim his debt to the state is satisfied as of right is the expiration of the maximum period fixed by his sentence, less such good conduct time as may be given by the statute. The so-called 'minimum sentence' is, and has been since its inception, merely a period at which, and not before, as a matter of

grace and not of right, the prisoner may be allowed to serve the balance of his sentence outside the walls of the penitentiary under such circumstances and conditions as the authorities may provide, or be discharged, but that the only *right* which such minimum period gives him is the right to *request* from the proper authorities such mitigation of his sentence.

"Such being the case, it seems to us that it would be absurd to hold that a credit given as a matter of right for the purpose of lessening the debt owed the state was meant to apply to a period fixed, not as the time when the offender might say, 'My debt is paid, full release is mine as of right,' but as the date when he might petition for permission to serve his sentence under easier conditions or be discharged, if the authorities, as a matter of grace consented thereto. We hold, therefore, that the good conduct time granted by the statute applies not to the minimum period fixed by the sentence, which, as we have stated, is not the time at which under any circumstances the prisoner is entitled to a full release as a matter of right, but to the maximum period, which is the only one at which the prisoner may claim as such right to be fully discharged from the consequences of his offense.

"It may be that eventually it will be decided that the determinist school of penology is right in its theory of punishment, and that our laws will be so amended and changed as to fully carry out such theory. In such case, of course, there would be no necessity for any minimum, maximum, or good conduct time. The authorities established by law would have full discretion to release a prisoner at any time which they in their judgment thought proper, even if it were the first day of his incarceration, or to retain him confined for the period of his natural life, no matter what his offense, if they believed he had not been fully restored to normalcy. This, however, is a question for the legislature and the people of the state to determine, and not for us. We can but declare the law as it exists * * *."

■ We held in Orme v. Rogers, supra,[1] the good time was to be deducted from the maximum sentence. This law has now been amended to provide that the deduction for good time be deducted for a first offender from the minimum sentence but for a second offender or more from the maximum term of the sentence. Since defendant is a second offender it must be deducted from the maximum. § 31–251, 10 A.R.S.

In the instant case we have two sentences for "not less than 25 years to life"—to run consecutively. When does the second sentence begin? The law specifically provides:

"When the sentence imposes imprisonment, it shall state the date at which the imprisonment is to begin." Rule 338, Rules Crim. Proc., 17 A.R.S.

"The term of imprisonment fixed by the sentence commences to run only upon actual delivery of defendant at the place of imprisonment, or from the time fixed by the court as the time when the term of imprisonment begins. * * *" § 13–1652, 5 A.R.S.

The question then is whether the judgment of the court made it definite as to when the second sentence would begin. Since good-conduct time is not subtracted from a minimum sentence where there is a prior conviction, to be eligible for parole, defendant would have to serve his full twenty-five years; however, as was held in Orme v. Rogers, supra, it would be a matter of grace and not of right as to whether he would be granted a parole.

We are therefore presented with the question as to what effect the probability of a parole or pardon of another sentence has on a case when there are consecutive sentences. We held, in Ard v. State, 102 Ariz. 221, 427 P.2d 913, that it was the duty of the court, where imprisonment could be for natural life except in sentences for first-degree murder, to fix both a minimum and a maximum sentence as provided for in § 13–1643, 5 A.R.S. The court, in pronouncing a sentence for life, must specifically state when it

is to begin, as set forth in Rule 338, Rules of Crim. Proc., 17 A.R.S.

■ Corpus Juris Secundum states the rule as follows [24B C.J.S. Criminal Law § 1996(7) p. 681]:

"*When consecutive sentence begins.* Legally, service of a sentence made consecutive to another or others cannot and does not begin until the other or others have been executed or satisfied; and this rule applies whether the period of the earlier sentences is shortened, as discussed below, lengthened, as because of an escape, or whether its terms are otherwise varied. A rule of law that a consecutive sentence shall begin on expiration of the maximum period of imprisonment under a prior sentence may not be altered by an erroneous practice of prison administration in recording the consecutive sentence as beginning on expiration of the minimum term of the preceding sentence; and the maximum of each prior sentence does not run concurrently with the minimum of the next sentence.

"Where a prisoner has been sentenced to two separate prisons for two successive terms, the second term will not begin until the prisoner is turned over to the authorities of the second designated prison."

In Jackson v. State, 91 Ga.App. 291, 85 S.E.2d 444, the court held:

"As to case No. 4922, however, a different question is presented. 'One * * * serving a sentence on probation is fulfilling his sentence as effectually as if confined in jail or on the chaingang.' Roper v. Mallard, 193 Ga. 684(2), 19 S.E.2d 525. Accordingly, and subject only to the differences inherent in the two forms of punishment, a probationary sentence is served in the same manner and subject to the rules of law relating to the service of sentences generally. One such rule is that, where the sentence expressly so states, the punishments for different offenses will be served consecutively rather than concurrently. Code § 27–2510; Long

v. Stanley, 200 Ga. 239, 36 S.E.2d 785. This is equally applicable to misdemeanor cases. Simmons v. Georgia Iron & Coal Co., 117 Ga. 305(8), 43 S.E. 780, 61 L.R.A. 739. Further, it is a general rule that, where sentences are served consecutively rather than concurrently, the second sentence does not begin until the date of termination of the first sentence, and this applies whether the period of the first sentence is shortened because of good behavior, lengthened because of an escape, or its term otherwise varied. 15 Am.Jur. 125, § 467. It follows that, where a prisoner is serving one of two or more consecutive sentences *within* the confines of a penitentiary, public-work camp or jail, orders relating to the nature or duration of his punishment as determined by his conduct within the penal institution affect only the sentence which he is serving, not a sentence upon which he has not yet embarked, and the same rule must apply to orders relating to the nature or duration of the defendant's punishment as determined by his conduct *outside* the penal institution, when he is serving a *probated* sentence."

In accordance with the rule set forth in the above authorities, since the court provided the second sentence to run consecutively with the first sentence of twenty-five years to life, the first sentence does not end until the termination of the life sentence.

In Application of Rye, 152 Cal.App.2d 594, 313 P.2d 914, defendant had been convicted on three counts—first-degree murder, and two armed robberies—and sentenced to life imprisonment for the murder and for the term prescribed by law on each of the robbery counts, the consecutive robbery sentences to run concurrently with the murder sentence.

The Penal Code of California provides that when a person is convicted of one or more crimes, and the punishment for any of them is especially prescribed to be life imprisonment, as in Application of Rye, supra, the terms for the other convictions shall be

merged and run concurrently with such life term. The court said:

"We have for interpretation a statute which declares that in the case of multiple convictions 'the second or other subsequent judgment shall direct whether the terms of imprisonment or any of them' shall run concurrently or consecutively. If the court pronouncing the second or other subsequent judgment fails to so determine, that court may, within a limited period of time thereafter, make such determination, failing which 'the term of imprisonment on the second or subsequent judgment shall run concurrently.' All of this is subject to an exception expressed in the form of a proviso: 'provided, however, if the punishment for any of said crimes is expressly prescribed to be life imprisonment, whether with or without the possibility of parole, then the terms of imprisonment on the other convictions, whether prior or subsequent, shall be merged and run concurrently with such life term.' Pen.Code, § 669.

"Clearly, when a case comes within this exception, as does our case, the court pronouncing sentence has no power to make any term run consecutively in relation to any of the other terms of imprisonment. Such a direction should be treated as having no legal effect. We so regard and declare it in this case.

\* \* \* \* \* \*

"Accordingly, in respect to the judgment before us, we hold that all terms of imprisonment run concurrently."

■ It will be noted that in Rye, supra, the court held that the lower court was bound by the directions in regard to such sentences provided in the statute, and any other term of imprisonment should be treated as having no legal effect. This is analogous to the instant case. Under Arizona law the court must fix the time of starting of sentence (Rule 338, Rules of Crim.Proc., 17 A.R.S.) or the case is governed by § 13–1652, supra, which provides that the sentence shall start at the time of delivery to the prison. While the statutory provisions are different the principle is analogous.

■ In the instant case, defendant was sentenced in the first case "to serve not less than 25 years to life in the State Penitentiary at Florence, Arizona." Also, it was further ordered that "such sentences, Cause No. 44880 and Cause No. 44489 run consecutively." In the second case defendant was "sentenced to serve not less than twenty-five (25) years to life in the State Penitentiary at Florence, Arizona, to run consecutively with sentence in Cause No.-44880." Therefore, the time fixed by the court was not definite and did not comply with Rule 338, supra. It did not state a definite time for the beginning of the second sentence. The time of death of an individual is indefinite, and, for that matter, he could not serve after death. Hence, § 13–1652, supra, would therefore be applicable, and the term of imprisonment on the second sentence would begin to run at the time of defendant's delivery to the penitentiary.

Defendant's sentence in both cases is "not less than 25 years to life," and, since neither sentence has a definite date for starting, the sentences began to run at the time defendant was delivered to the Arizona State Prison.

■ Defendant also contends that he was deprived of the opportunity of having his punishment fairly determined by reason of inflammatory and notorious newspaper coverage of his crimes, and that the sentences were disproportionate to the crime involved, and that the punishment imposed is greater than should be inflicted under the circumstances of the cases, and for this reason this Court should reduce the sentence by authority of § 13–1717, 5 A.R.S. We do not feel the record would justify a reduction of the sentence in this case. We have consistently held that a sentence within the statutory limitation is not cruel and unusual punishment where the statute fixing punishment is not unconstitutional. State v. Vineyard, 96 Ariz. 76, 392 P.2d 30; State v. Cuzick, 97 Ariz. 130, 397 P.2d 629.

Furthermore, the facts and circumstances of the instant case justify restraint of the individual for the protection of society against him. As previously stated, defendant has a long record of sex deviation involving small girls.

As previously pointed out, his own psychiatrists admit that society is entitled to protection against him unless and until he can be rehabilitated. However, they merely state that rehabilitation is the goal, and do not definitely state that it has been proved that he can be rehabilitated. Both admit that any treatment for rehabilitation must be made while he is under restraint. If defendant spends the rest of his natural life in the penitentiary, it will undoubtedly be because the Board of Pardons and Paroles is not convinced that he has become rehabilitated. We hold that the sentence in each case is to start from the time defendant was delivered to the Arizona State Prison.

Judgment is affirmed in each case in accordance with this decision.

STRUCKMEYER and LOCKWOOD, JJ., concur.